**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MARK BASILICA and ROBERTA BASILICA, Administrators**
**of the Estate of THERESA MARIE BASILICA, Deceased,**

        **Plaintiffs,**

**v.**                              **Civil Action No. 3:22-cv-382-JAG**

**SHERIFF ROGER L. HARRIS, in his individual**
**and official capacities,**

**RACHEL CATHERINE VEGA**
**a/k/a RACHEL CATHERINE KIECANA,**

**and**

**JASON CHARLES MORRIS,**

        **Defendants.**

## AMENDED COMPLAINT

COMES NOW Plaintiffs Mark Basilica and Roberta Basilica, Administrators of the Estate of Theresa Marie Basilica, Deceased ("Plaintiffs"), by counsel, and states as follows for their Amended Complaint against Defendants Sheriff Roger L. Harris, Rachel Catherine Vega a/k/a Rachel Catherine Kiecana, and Jason Charles Morris, all named as defendants herein (collectively "Defendants"):

## NATURE OF ACTION

1.      This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking damages against Defendants for acts committed under the color of law, which deprived decedent Theresa Marie Basilica ("Basilica") of rights secured under the Constitution and laws of the United States of America.

2.      In addition, this action seeks damages against Defendants for their violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132 and § 504 of the

Rehabilitation Act, 29 U.S.C. § 794(a), for discriminating against Basilica, a qualified individual with disabilities, and excluding her from participation in and denying her the benefit of services, programs, or activities of a public entity, that receives federal funds, on account of such disabilities.

3.     Finally, this action seeks damages against Defendants pursuant to Va. Code §§ 8.01-50 et seq. for Basilica's wrongful death, proximately caused by Defendants' common law gross negligence and/or willful and wanton conduct.

## JURISDICTION AND VENUE

4.     Jurisdiction exists in this case pursuant to the Fourth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. § 12133, 29 U.S.C. § 794a, and 28 U.S.C. §§ 1331 and 1343.

5.      This Court has pendent and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because the events underlying this action occurred within the jurisdiction of the United States District Court for the Eastern District of Virginia, Richmond Division.

## THE PARTIES

7.     Plaintiffs are Virginia residents who qualified as Co-Administrators of the estate of their daughter, Theresa Marie Basilica, on October 6, 2020.  Basilica died on August 31, 2020, at age 30, in Fredericksburg, Virginia, following a self-inflicted gunshot wound while within the protective care, custody, and control of Defendants pursuant to a temporary detention order ("TDO") issued on August 30, 2020, pursuant to Va. Code §§ 37.2-809, 810.  Prior to her death, Basilica had been a resident of Spotsylvania County, Virginia.  Copies of Basilica's death certificate and Plaintiffs'

Certificate/Letter of Qualification are attached as Exhibits A and B, respectively, and are incorporated herein by reference.  Plaintiffs bring this matter in their capacity as Administrators of Basilica's Estate.

8.     Basilica's statutory beneficiaries under the Wrongful Death Act, Va. Code §§ 8.01-50 et seq., are her parents Mark and Roberta Basilica, and four siblings: George Basilica, Henry Basilica, Pia Basilica, and MaryJane Basilica.

9.     Defendant Sheriff Roger L. Harris ("Harris") is and was at all times relevant herein the Sheriff of Spotsylvania County, Virginia.  Harris is sued in his individual and official capacities.

10.     At all times relevant herein, including as early as August 16, 2018, Harris was the head of, and final policy decisionmaker for, the Spotsylvania County Sheriff's Office ("SCSO"), was an employee, agent, and/or servant of the SCSO, acting within the course and scope of his employment, agency, and/or service with the SCSO, and under color of law.

11.     Harris operated and managed the SCSO and directed and supervised its personnel.

12.     Among his duties, Harris was the point person for, and ultimate decisionmaker within, the SCSO for developing, implementing, revising (as necessary), and ensuring the training (and retraining) of SCSO employees, agents, and servants on the SCSO's law enforcement policies, procedures, and protocols including, among other things, those policies, procedures, and protocols related to the handling, searching, seizing, detention, monitoring, and transportation of individuals suffering from mental and/or behavioral health conditions, especially those policies, procedures, and protocols related to the appropriate restraint and supervision of such individuals and ensuring they do not have access to weapons at any point during the handling, searching, seizing, detention, monitoring, and transportation of such individuals.  Consistent with those duties

and responsibilities, Harris had plenary authority to make changes to SCSO policies, procedures, and protocols.

13.     As a sheriff, Harris is and was at all times relevant herein a law enforcement officer locally elected as provided for by Article VII, Section 4 of the Constitution of Virginia.

14.     The office of sheriff is a "public entity" as defined by 42 U.S.C. § 12131, and concomitantly at all times relevant herein Harris was a "public entity."

15.     At all times relevant herein and currently, Harris in his capacity as Sheriff has been an entity that received and continues to receive significant sums of federal grant money.

16.     Defendant Rachel Catherine Vega a/k/a Rachel Catherine Kiecana (hereinafter "Vega") was at all times relevant herein a Deputy Sheriff holding the rank of Deputy Sheriff, and an employee, agent, and/or servant of Harris and the SCSO, and acting within the course and scope of her employment, agency, and/or service with Harris and the SCSO, and under color of law. Vega is sued in her individual capacity.

17.     At all times relevant herein, Vega was a Deputy Sheriff whose duties included, among other things, the handling, searching, seizing, detention, monitoring, and transportation of individuals suffering from mental and/or behavioral health conditions, including individuals subject to a TDO such as Basilica.

18.     In particular, at all times relevant herein, Vega was assigned to the Courts & Civil Process Division of the SCSO.  By virtue of their specialized education, experience, and/or training, only deputies assigned to the SCSO's Courts & Civil Process Division were authorized to transport of individuals subject to a TDO.

19.     Defendant Jason Charles Morris ("Morris") was at all times relevant herein a Deputy Sheriff holding the rank of Deputy Sheriff, and an employee, agent, and/or servant of Harris and the

4

SCSO, and acting within the course and scope of his employment, agency, and/or service with Harris and the SCSO, and under color of law.  Morris is sued in his individual capacity.

20.     At all times relevant herein, Morris was a Deputy Sheriff whose duties included, among other things, the handling, searching, seizing, detention, monitoring, and transportation of individuals suffering from mental and/or behavioral health conditions, including individuals subject to a TDO such as Basilica.

21.     In particular, at all times relevant herein, Morris was assigned to the Courts & Civil Process Division of the SCSO.  By virtue of their specialized education, experience, and/or training, only deputies assigned to the SCSO's Courts & Civil Process Division were authorized to transport of individuals subject to a TDO.

## STATEMENT OF FACTS

### *The Dennis Christopher Howard Incident*

22.     On August 16, 2018, SCSO deputies responded to 3108 Mine Road, Fredericksburg, Virginia 22408, for a report of a missing individual, Dennis Christopher Howard ("Howard"), who resided at that location and had left on his kitchen table a suicide note that was found by a friend and coworker of Howard, Linwood Chavis.  Chavis notified SCSO deputies of the suicide note, and that Howard was likely in possession of a firearm.

23.     After an extensive search, SCSO deputies located Howard in a deserted commercial area.  Howard was apprehended and taken into the custody of the SCSO deputies, including Deputy Sheriff David Setlock.

24.     Howard admitted to SCSO deputies that he was in possession of at least one operable firearm as well as ammunition for a shotgun.  As a convicted felon, it was unlawful for

Howard to own or possess a firearm or ammunition, and the SCSO deputies knew it was unlawful for Howard to own or possess a firearm or ammunition.

25.     Howard was handcuffed with a "daisy chain" in which two sets of handcuffs were connected to one another to restrain Howard's arms behind his back.  Howard was then placed into the back of Setlock's cruiser.

26.     Setlock then transported to the 3108 Mine Road address.  After returning to Howard's residence, Setlock got out of the cruiser and opened both back doors to the cruiser.  More importantly, Setlock allowed the window between the rear compartment of the cruiser and the front compartment of the cruiser to be left open.

27.     Setlock then congregated with other SCSO deputies in front of Howard's residence, and they began to speak with one another.  Howard, however, was left unattended and unsupervised in the back of Setlock's cruiser.

28.     While in the back of the cruiser, unattended and unsupervised, Howard was able to place a cellular telephone call to Chavis in which he stated, "tell my mother that I'm sorry." Howard then managed to get into the front compartment of Setlock's cruiser through the open window that separated the rear compartment from the front compartment, obtain a firearm, and shot himself in the head.  Howard survived the gunshot wound but allegedly suffers permanent and catastrophic injuries including a severe traumatic brain injury.

29.     Between the date of the Howard incident on August 16, 2018, and the date of Basilica's death on August 31, 2020, neither Harris nor the SCSO effected any changes in SCSO policies, procedures, or protocols relating to the handling, searching, seizing, detention, monitoring, and transportation of individuals suffering from mental and/or behavioral health conditions.  More particularly, following the Howard incident, and continuing to the present,

6

neither Harris nor the SCSO has effected any changes in SCSO policies, procedures, or protocols related to the handling, searching, seizing, detention, monitoring, and transportation of such individuals to ensure they do not have access to weapons.

30.     Following the Howard incident on August 16, 2018, and continuing to the present, neither Harris nor the SCSO conducted any training or retraining for SCSO employees, agents, or servants related to the handling, searching, seizing, detention, and transportation of individuals with mental and/or behavioral health conditions.   More particularly, following the Howard incident, and continuing to the present, neither Harris nor the SCSO has conducted any training or retraining related to the handling, searching, seizing, detention, monitoring, and transportation of such individuals to ensure they do not have access to weapons.

*Theresa Marie Basilica*

31.     On August 30, 2020, at approximately 7:17 a.m., Basilica voluntarily presented herself to Mary Washington Hospital ("MWH") in Fredericksburg, Virginia.   At triage, she was noted to have a rapid heart rate, elevated respiratory rate, and high blood pressure.   Basilica was noted to have manic behavior stating that she had been manic since April 2020, was very paranoid believing someone was in her car, and was having trouble seeing.   The following is a true and accurate picture of Basilica as she presented herself to MWH the morning of August 30, 2020:



32.     At the time she voluntarily presented herself to MWH on August 30, 2020, Basilica was 5 feet tall, weighed 115 pounds, and was dressed in a light wind breaker, short shorts with belt, tank top, sports bra, underwear, flip-flops, and a bandana.

33.     Stephen Balleh, DO, the attending physician, then performed an evaluation of Basilica.  He noted Basilica's chief complaint as being manic since April, paranoid thinking someone was in her car, and having trouble seeing.  Balleh noted that Basilica was a 30-year-old female with a past medical history notable for attention deficit disorder, obsessive-compulsive disorder, and bipolar 1 disorder, who presented to the emergency department for a psychiatric evaluation.  Balled noted that Basilica stated that she and her boyfriend got into an argument the previous night after she thought he was a police officer.  Balleh noted that Basilica stated she had left their residence and driven around Fredericksburg, and that while driving through the city she "started a police chase with [herself]."  According to Balleh, Basilica complained of mania (present for the past four months) and paranoia.

34.     Balleh noted Basilica's presenting symptoms as manic episode.  He also noted that Basilica appeared to be noncompliant with medications and treatment and had severe incapacity that was worsening and recurrent.  Balled also noted that Basilica was agitated, nervous/anxious, and had sleep disturbance.  Balleh gave a clinical impression of bipolar affective disorder (remission status unspecified), anxiety, and substance use disorder.

35.     At 8:00 a.m., Basilica was taken to room 33 in the emergency department.  Balleh ordered a psychiatric consultation.

36.     At 8:37 a.m., MWH personnel performed a security search of room 33 and prepared it especially for receipt of a behavioral health patient including the removal of all sharp objects, all monitor cables, unnecessary cords and equipment, the telephone, gloves, bottles/contains of solution, extra bed linens, and trash cans.  In addition, a sign was posted on the door stating that visitors were required to report to the nurse's station prior to entering the room, and that visitors were not permitted to take anything into the room.  Finally, Basilica's belongings were removed and cataloged.

37.     At 8:37 a.m., Tessa M. Lange, MSW began a mental health evaluation of Basilica.  She noted that Basilica had diagnostic impression/assessment of bipolar disorder not otherwise specified.  Lange noted that Basilica was a "High Suicide Risk," but that she was unable to assess Basilica's suicidal ideation intensity score.  Lange noted that risk factors for Basilica included triggering events leading to humiliation, shame, and/or despair, substance intoxication or withdrawal.  Lange noted that Basilica presented with symptoms of impulsivity, hopelessness or despair, anxiety and/or panic, and psychosis.  According to Lange, Basilica stated that she had been manic since April, was very paranoid and thought someone was in her car, and that she was having trouble seeing.

9

38.     Lange found Basilica to be tearful with impaired focus and poor eye contact. Lange also noted that Basilica stated she had driven to the emergency room twice the previous night but believed there was someone in either the backseat or trunk of her car, and therefore was too afraid to exit her vehicle to come inside. Lange also noted that Basilica stated that her boyfriend had locked up his firearms the night before due to her behavior, which caused an argument prompting Basilica to leave.  Lange noted that Basilica endorsed auditory and visual hallucinations.

39.     According to Lange, Basilica also talked about her distrust for law enforcement stating she "hates cops," "they are bad people," she's "terrified" of them, and if they are ever around "something terrible is going to happen."

40.     Lange noted that she asked Basilica whether she's recently felt she'd rather be dead or would like to go to sleep and not wake up.  According to Lange, Basilica responded: "I'm not going to answer this, I already know this is going to lead to a psychiatric hold."  Lange noted that Basilica then said, "But no I don't want to wake up ever."  Lange then asked Basilica about suicidal ideation at which point Basilica stated, "I've been trying with fentanyl in my arm."  Lange also noted that Basilica stated with regards to overdose or death, "If it happens, it happens." According to Lange, Basilica also stated that the week prior she had injected "too much" intentionally.  Lange also noted that Basilica stated she had abruptly quit her employment after flipping out on her boss.

41.     Lange noted that Basilica stated she had not been coping with the April death of her significant other of 10 years and stated, "It doesn't hurt any less."  In addition, Lange noted that Basilica stated she had come to the emergency room because "I just need the panic to stop," and "So I can calm down."

10

42.     Lange recorded that Basilica stated she was willing to be admitted for psychiatric hospitalization, "If it means I don't have to go to jail."  Lange also recorded that Basilica stated she would rather "self-admit" than be admitted under a "TDO."  In addition, Lange noted that Basilica stated that she was unwilling to take psychiatric medication and has always refused such medication because "I don't like the way it makes me feel."

43.     Lange noted that she had concerns for patient's capacity and ability to maintain consent for inpatient psychiatric hospitalization.

44.     Lange evaluated Basilica using the Columbia Suicide Severity Rating Scale ("C-SSRS"), and had Kelly Garcia, RN note the following findings in Basilica's chart:

| 08:37 | Columbia Suicide Severity Rating Scale (C-SSRS Short Version) | TL |
|---|---|---|

Columbia Suicide Severity Rating Scale
1. Wish to be Dead:  Yes  (Patient initially declined to answer, stating "I already know this is going to lead to a psychiatric hold"; She then confirmed she doesn't ever want to wake up.)
2. Suicidal Thoughts:  Yes
3. Suicidal Thoughts with Method Without Specific Plan or Intent to Act:  No
4. Suicidal Intent Without Specific Plan:  No
5. Suicide Intent with Specific Plan:  Yes  (See Question #6)
6. Suicide Behavior Question:  Yes  (Patient states she's "been trying with fentanyl in my arm"; She states each time she injects with the attitude "If it happens, it happens", and last week she injected "too much" intentionally.)

| 08:37:40 | ED Notes | KG |
|---|---|---|

Tessa from MH at bedside to evaluate pt

Kelly O Garcia, RN
08/30/20 0837

45.     Lange found Basilica exhibited or endorsed anxiety and panic, hopelessness, impaired concentration, auditory and visual hallucinations, paranoia, and self-injurious behavior/risky behavior.  Lange found Basilica to be unkempt and with poor eye contact. Her mood was anxious, and her attention was impaired.  Lange found Basilica possessed suicidal thoughts and was delusional.  Lange also found that Basilica possessed limited insight and impaired judgment.

46.     Lange also noted that Basilica shared that she had 3-4 prior psychiatric hospitalizations, and that she surmised Basilica had been previously involuntarily admitted

because she used the term "TDO."  Lange noted that Basilica stated her last hospitalization was 8-10 years ago.

47.     Lange recommended psychiatric hospitalization for Basilica due to high suicide risk, paranoia, recklessness, and possible auditory and visual hallucinations.

48.     At approximately 9:07 a.m., MWH Security Officer Ky Friend conducted a search of room 33 and Basilica.  Friend searched around Basilica's waist but not her breast area as he was not comfortable since she was female.  Friend searched Basilica's purse and did not find any firearms.  Friend confiscated matches, two lighters, and several cigarettes.  Friend also plugged Basilica's phone into a wall outlet at the psychiatric desk, at Basilica's request.  Basilica asked that her purse not be confiscated because she had had past issues with theft.  Since Friend had found no weapons in the bag, Basilica was allowed to keep it.

49.     At 9:19 a.m., Lange noted the following: "Patient was assessed and is recommended for inpatient psychiatric hospitalization; she will be prescreened upon medical clearance due to concern for her ability to maintain consent.  Spoke with Dr. Balleh and requested a COVID test and security 1:1."

50.     At 9:20 a.m., Balleh placed an order for continuous one-to-one security observation of Basilica.  At 9:22 a.m., Basilica gave a urine specimen for a rapid drug screen.

51.     At 9:30 a.m., Garcia began a psychosocial evaluation of Basilica.  Garcia noted that Basilica was agitated, anxious, crying, fearful, hyper-verbal, impulsive, pacing, and was inconsistent with thought content.  By 9:30 a.m., continuous one-to-one security was in place.

52.     At 9:32 a.m., Garcia completed her psychosocial evaluation of Basilica, noting the following aberrations:

| 09:32 | Psychosocial | Psychosocial | Kelly O Garcia, |
|---|---|---|---|
| | | Patient Behaviors/Mood: Agitated; Anxious; Crying; Fearful; Flight of ideas; | RN |
| | | Impulsive; Pacing; Restless | |
| | | Affect: Inconsistent with thought content | |
| | | **General Appearance** | |
| | | Motor Activity: Agitation; Restlessness | |
| | | Speech Pattern: Repetitive; Rapid | |
| | | General Attitude: Suspicious | |
| | | Appearance/Hygiene: Disheveled | |
| | | **Thought Process** | |
| | | Judgment: Poor | |
| | | Confusion: None | |

Garcia also performed a skin assessment which noted that Basilica had multiple scab/puncture like areas on her thighs and lower legs.

53.     At 9:41 a.m., Larry Lawson with MWH entered the results of rapid drug screen results.  The drug screen was presumptively positive for cannabinoid, methamphetamine, and amphetamine.

54.     At 11:23 a.m., Lange spoke with the Rappahannock Area Community Services Board ("RACSB") and requested a prescreen evaluation.

55.     At 11:37 a.m., Krysta Thomas, RIC with the RACSB conducted the prescreen evaluation requested by Lange due to Basilica "presenting as manic and lacking capacity to consent to treatment."

56.     At 12:02 p.m., Basilica refused to have her vitals taken by Rachael Phillips, RN, who had assumed care of Basilica shortly after 11:00 a.m.  Phillips noted that Basilica stated that she "hope[d] her covid was positive so she could die a slow miserable death." Phillips had Basilica's phone, purse, and colored pencils confiscated by security and placed in a locker.  Basilica flung a cup of water and blood pressure cuff at the sink in the room. Basilica yelled at Phillips calling her a "bitch" and a "cunt."  Finally, Phillips noted that upon the orders of Dr. Balleh, Basilica took 1 mg tablet of Lorazepam (Ativan), a benzodiazepine used to treat anxiety.  Lange noted that Basilica could be heard shouting "Let me die" from the hall with the doors closed.

13

57.     At 12:10 p.m., Basilica refused to have her clothing removed for purposes of allowing MWH staff to conduct a 12-lead echocardiogram ("ECG").  Nevertheless, at 12:14 p.m., Phillips was able to successfully complete the ECG.

58.     At 12:19 p.m., Lange received a call from Thomas who stated that Basilica met the criteria for a TDO.  Lange informed Thomas that Snowden at Fredericksburg, a behavioral health facility, was at capacity, meaning that no beds were available.  Thomas stated that she would petition for an emergency custody order ("ECO") under Va. Code § 37.2-808.

59.     In support of her request for an ECO, Thomas noted that Basilica had been heard in the emergency department multiple times stating: "I want to die."  Thomas also noted that Basilica endorsed a suicide plan, and possibly had access to means to commit suicide. Thomas noted that Basilica had expressions of aggression and anger in the form of yelling, cussing, throwing items in the room and at staff.  Thomas also noted that Basilica exhibited fight or attempted fight behaviors in the form of throwing objects.  Thomas noted that Basilica evidenced reckless behavior as evidenced by driving erratically.

60.     With respect to Basilica's current symptoms, Thomas noted high anxiety, stress, and emotional pain, hopelessness, anger, and increased depressive symptoms.  Thomas also noted that Basilica lacked capacity.  Thomas noted that Basilica was restless, agitated, manic, impulsive, tearful, and her speech was pressured.  Thomas further noted that Basilica's mood was depressed, angry, hostile, anxious, and anhedonic.  Thomas found Basilica's affect to be labile, and her thought content to be unfocused and paranoid.  Thomas also found Basilica's thought process to be perseverative, and her judgment to be poor.  Thomas noted that Basilica was showing symptoms of psychosis.

14

61.     With respect to the feasibility of less restrictive alternatives other than an ECO or TDO, Thomas noted that there were no available resources sufficient to address immediate suicide risk and person-specific triggers.   In addition, Thomas noted that there were no available resources sufficient to improve Basilica's ability to care for herself and basic needs.

62.     Thomas noted the following regarding Basilica's behavior in the emergency room:[1]

> **Summary of presenting crisis** (including person and collateral perspectives):
>
> A prescreen was requested by Tessa Lange due to SI, paranoia, delusions, and lacking capacity to consent to treatment. Due to the erratic presentation of the client, an MIECO was initiated at 1:04p by Krysta Thomas with RACSB.
>
> Per MWH, client presented to the ED after an argument with her boyfriend. Client stated she thought he was a police officer and then drove around Fredericksburg thinking police were following her. Client reported that she has often been seeing lights around her while driving. Client states that she has been experiencing AH, but no one believes her. When questioned about SI, client refused to answer stating she knew it would lead to a psychiatric hold. Later she stated that she has been trying to kill herself by injecting Fentanyl and endorsed a deliberate OD last week. Client endorsed an increase in drug use with the intent to die.
>
> As client was in the ED, her behaviors became increasing erratic. Client dumped water on her bed, threw colored pencils at the wall, threw the blood pressure cuff at the nurse, and could often be heard yelling that she wanted to die. Client became highly angry when the security staff removed her personal belongings due to the behaviors and was often cussing and yelling at staff. Due to this increase in behaviors, and MIECO was obtained for the safety of client and staff.

63.     At 12:36 p.m., Magistrate June E. Tomiko entered the ECO (ECO 630GM2000004921) for Basilica.   A true and accurate copy of the ECO is attached hereto as Exhibit C and incorporated herein by reference.   The ECO noted that Tomiko had found that:

> Pursuant to § 37.2-808, [Basilica] is incapable of volunteering or unwilling to volunteer for treatment, has a mental illness and is in need of hospitalization or treatment, and there exists a substantial likelihood that, as a result of mental illness, [Basilica] will, in the near future, cause serious physical harm to self or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information OR suffer serious harm due to [Basilica's] lack of capacity to protect self from harm or to provide for [her] own basic human needs.

Id.

---

[1] "MIECO" stands for mental illness emergency custody order, Va. Code § 37.2-808.

64.     The ECO directed the Fredericksburg Police Department to take Basilica into custody at MWH, and to keep her "in custody until (a) a temporary detention order is issued in accordance with § 37.2-809, (b) an order for temporary detention for observation, testing or treatment is entered in accordance with § 37.2-1104, ending law enforcement custody, (c) the respondent is released, or (d) this emergency custody order expires."  Id.

65.     At 1:02 p.m., Phillips noted that Basilica had been placed under an ECO. Phillips also noted that Basilica ran out of bed and sat on the floor and had to be placed into the bed with assistance of security and an officer.

66.     The ECO was served upon Basilica at approximately 1:11 p.m. by Spotsylvania County Sheriff's Office Deputy Kaitlyn Herzig ("Herzig"), who had been working as the MWH's Crisis Assessment Center ("CAC") law enforcement officer since 11:45 a.m. that day.

67.     By virtue of Virginia Code requirements and Mutual Aid Agreements executed by various law enforcement agencies within the Rappahannock Area, including Harris and the SCSO, in February 2020 (copies attached hereto collectively as Exhibit D), because Herzig with the SCSO served the ECO upon Basilica, Basilica thereupon became the charge of Harris and the SCSO, as well as their employees, agents, and servants, including but not limited to Vega and Morris.

68.     With Herzig's service of the ECO, Harris and the SCSO, as well as their employees, agents, and servants, including but not limited to Vega and Morris, thereupon became unequivocally responsible for any and all constitutional, statutory, and common law duties for Basilica's care, custody, and control, and they would remain so dutybound until Basilica's untimely death.

16

69.     At 1:22 p.m., Phillips noted that Basilica refused to have her vitals taken, was combative, and with an altered level of consciousness.  Upon the orders of Dr. Balleh, who witnessed Basilica's behavior, Phillips gave Basilica a 5 mg injection of Haldol, an antipsychotic medication, intramuscularly into Basilica's right thigh, and another 2 mg of Lorazepam (Ativan) by intramuscular injection into Basilica's left thigh.

70.     Basilica was also transferred from room 33 to room 32.

71.     Neither Herzig nor any other employee, agent, and/or servant of Harris or the SCSO would ever perform a security search of room 32.

72.     At 1:23 p.m., Phillips noted that Basilica was "sedated due to patient is yelling and kicking her feet in bed trying to get out of bed that she is handcuffed to and unable to calm patient down and MD observed patient exhibiting this behavior and ordered medication to sedate patient."

73.     At 2:00 p.m., Basilica was noted to be asleep.

74.     At 3:00 p.m., Phillips noted that Basilica's mother had called and was notified that Basilica was under an ECO and that MWH was awaiting a bed search.  At 4:47 p.m., Dr. Balleh noted that Basilica was to be transferred to an outside behavioral health facility.

75.     Basilica continued to rest for several hours, during which time MWH personnel attempted to find Basilica a bed for inpatient hospitalization as Basilica's ECO was converted to a TDO.

76.     As of August 30, 2020, and indeed continuing to the present, under Virginia law, a TDO can only be issued for those individuals with a mental illness for which there is a substantial likelihood that, as a result of mental illness, the person *will* in the *near future*:

17

(a)    *cause serious physical harm to himself or others* as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any; or

(b)    *suffer serious harm* due to his lack of capacity to protect himself from harm or to provide for his basic human needs.

See Va. Code § 37.2-809(B) (emphasis added).[2]

77.    Thus, as of August 30, 2020, it was firmly established Virginia law that TDOs were <u>only</u> issued for individuals who were *substantially likely* to be a *harm* to *themselves or others* in the *near future*.

78.    In support of her request for a TDO for Basilica, Thomas noted that "Client is presenting as highly erratic and manic.  Client has been driving excessively and reports only feeling better when high.  At this time, client is unstable and a danger to herself and lacks the capacity to consent to treatment.  A TDO will be issued.  Placement is pending a bedsearch." In her report to the Court, Thomas noted that there was a substantial likelihood that Basilica would commit serious physical harm to herself, and that there was a substantial likelihood that, as a result of mental illness, in the near future she would suffer serious harm due to the lack of capacity to protect herself from harm or provide for her basic human needs.

79.    Accordingly, at 7:38 p.m., Magistrate Frederick D. Howell, Jr. issued a TDO (TDO 177GM-2000009961) for Basilica. A true and accurate copy of the TDO issued for Basilica is attached hereto as Exhibit E and incorporated herein by reference.

---

[2] The other statutory criteria are the individual must be: (i) in need of hospitalization or treatment; and (ii) unwilling to volunteer or incapable of volunteering for hospitalization or treatment.  <u>See</u> Va. Code § 37.2-809(B).

80.     At 9:23 p.m., Carie Staley, MSW noted that according to RACSB, Western State Hospital ("Western State"), a state psychiatric hospital in Staunton, Virginia, was requesting updated vitals and ECG.

81.     At 10:48 p.m., Staley noted that Basilica had been accepted as a TDO to Western State, and that Basilica would be transported by law enforcement in accordance with the TDO's terms.

82.     At 10:49 p.m., David Michael Garth, MD, who had taken over as Basilica's attending physician, noted that Basilica's disposition had been set to be transferred to an out of network facility.

83.     At 11:30 p.m., Lakia Lennon, MSW noted that Basilica had been accepted as a TDO to Western State and that Basilica would be transported by law enforcement.

84.     At 11:41 p.m., Regina Winner, RN gave a report to a nurse at Western State.

85.     At approximately 11:55 p.m. SCSO Deputy William Schroeder, Jr. ("Schroeder") arrived at MWH to assume responsibility as the CAC law enforcement officer on duty.

86.     At approximately 11:57 p.m., another ECG was successfully performed on Basilica.

87.     At approximately 12:16 a.m. on August 31, 2020, Vega and Morris arrived at room 32 along with a wheelchair for purposes of transporting Basilica to Western State.

88.     Vega and Morris had been specially dispatched to MWH for purposes of transporting Basilica, and prior to arriving at MWH, they had actual knowledge, conveyed to them by dispatch, that they would be transporting a patient who was subject to a TDO.

19

89.     Prior to August 30, 2020, both Vega and Morris knew and had actual knowledge, by virtue of their education, experience, and/or training as law enforcement officers, that TDOs were <u>only</u> issued for individuals who were *substantially likely* to be a *harm* to *themselves or others* in the *near future*.

90.     Indeed, at all times relevant herein, both Vega and Morris were specially assigned to the Courts & Civil Process Division of the SCSO, the only Division within the SCSO authorized to transport individuals subject to a TDO.  By virtue of their specialized education, experience, and/or training as members of the Courts & Civil Process Division, both Vega and Morris knew of the potential dangers associated with the handling, searching, seizing, detaining, monitoring, and transporting of an individual subject to a TDO. Moreover, by virtue of their assignment to the Courts & Civil Process Division of the SCSO, Vega and Morris had specific firsthand knowledge that TDOs were <u>only</u> issued for individuals who were *substantially likely* to be a *harm* to *themselves or others* in the *near future*.

91.     Furthermore, although Morris did not have firsthand contact with Basilica until approximately midnight on August 30, 2020, he had been in telephone contact with Deputy Herzig at MWH throughout the day on August 30, 2020, to discuss Basilica's case, because Morris was aware that he might ultimately be called upon to transport Basilica should a TDO be issued and a bed be found for her.

92.     Upon arriving at room 32, Morris read Basilica's TDO which was at the CAC desk just outside of room 32.

93.     Specifically, at the CAC desk outside of room 32, Morris read the document attached hereto as Exhibit E.

94.     Basilica's TDO, which Morris read, stated in no uncertain terms:

20

[X]    AGENCY/FACILITY                                    TELEPHONE NUMBER
§ 37.2-809, it appearing from all evidence readily available, including any recommendation from a physician, clinical psychologist, or clinical social worker treating the person, and if available, information provided by the person who initiated emergency custody, that the person (i) has a mental illness, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future, (a) cause serious physical harm to him/herself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information or (b) suffer serious harm due to his/her lack of capacity to protect him/herself from harm or to provide for his/her basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

95.    At approximately 12:18 a.m., Vega and Morris entered room 32 along with the wheelchair.

96.    Vega woke Basilica up and advised her that she was there to take Basilica to another facility.  Basilica thereupon became upset telling Vega that she wanted to stay in Fredericksburg.

97.    Vega and Morris, with the assistance of Schroeder, then did something that would severely exacerbate and worsen Basilica's mental status, her mental health crisis, and the situation generally: they placed Basilica in restraints.

98.    The International Association of Police Chiefs ("IACP") August 2018 Model Policy, *Responding to Persons Experiencing a Mental Health Crisis*, notes that "Officers should be aware that the application or use of restraints may aggravate any aggression being displayed by a PIC [person in crisis]."

99.    At all times relevant herein, both Vega and Morris knew and had actual knowledge, by virtue of their education, experience, and/or training as law enforcement officers, that people do not like to be placed into restraints against their will.

100.   More specifically, at all times relevant herein, both Vega and Morris knew and had actual knowledge, by virtue of their education, experience, and/or training as law enforcement officers, and in particular as law enforcement officers specially assigned to the Courts & Civil Process Division of the SCSO, that placing a PIC in restraints could aggravate an individual suffering from a mental and/or behavioral health crisis.

21

101.  As stated previously, when Basilica had presented to MWH the morning of August 30, 2020, Basilica had stated that she and her boyfriend had gotten into an argument the previous night after Basilica thought he was a police officer.

102.  Basilica had also stated earlier in the morning that she had left her residence and driven around Fredericksburg believing she was being followed and "started a police chase with [herself]."

103.  Basilica had also stated earlier in the morning that she distrusted law enforcement, "hates cops," "they are bad people," she's "terrified" of them, and if they are ever around "something terrible is going to happen."

104.  Basilica had also stated earlier in the morning that she was willing to be admitted for psychiatric hospitalization, "If it means I don't have to go to jail."  Lange also recorded that Basilica stated she would rather "self-admit" than be admitted under a TDO.

105.  Finally, as noted previously (supra at ¶ 72), Basilica had been previously yelling and kicking her feet upon being handcuffed to her bed.

106.  Notwithstanding the foregoing, Vega and Morris, with the assistance of Schroeder, triggered Basilica's worst nightmares by the application of restraints.

107.  Vega, Morris, and Schroeder placed leg shackles on Basilica.  With this, Basilica began kicking and resisting again.  Basilica commented several times that she had done nothing wrong and asked why the deputies were taking her to jail.

108.  The deputies placed Basilica in a belly chain, with handcuffs off to each side.

109.  Basilica became combative and struggled with the deputies.

110.  The deputies transferred Basilica to a wheelchair, exited the room at approximately 12:23 a.m., and began to take Basilica out of the hospital.

111.    Morris restrained Basilica to the wheelchair as he pushed it by pulling on her jacket hood.

112.    Vega restrained Basilica to the wheelchair by use of force upon Basilica's arm.

113.    As Basilica was being pushed through the hospital, Basilica was being combative and screaming at the deputies.  Vega stated that Basilica was upset and angry.  The following are true and accurate pictures of Basilica as she was being taken by wheelchair by Vega and Morris through the halls of MWH:





114.    As they exited the hospital, Basilica saw that she was being taken to a law enforcement vehicle, a 2017 Ford Explorer SUV, and, according to Vega, "freaked out."

115.    Vega and Morris placed Basilica in the right rear seat of their vehicle and began to depart MWH for Western State at 12:26 a.m. on August 31, 2020.

116.    Basilica yelled and screamed that she wanted her mother and didn't want to go to Western State.

117.    After having traveled only approximately 1000 yards from the hospital in the back of the SUV, Basilica placed a .357 caliber SP101 Ruger revolver that she had secreted on her person into her mouth and shot herself.  She died instantly.

118.    Upon information and belief, the revolver Basilica shot herself with was 7.2 inches in length, and weighed approximately 1 pound, 10 ounces unloaded.[3]

---

[3] https://www.ruger.com/products/sp101/specSheets/5718.html (last visited July 27, 2022).

119.    The following is a true and accurate picture of the revolver with which Basilica took her own life:



120.    Between the time Vega and Morris made initial contact with Basilica at MWH and Basilica taking her own life, neither defendant ever performed a pat-down search on Basilica.  Had they done so, they would have discovered and retrieved the revolver with which Basilica took her own life.

### *SCSO Personnel Left Basilica Unattended Throughout The Day*

121.    Although Basilica's ECO was issued at approximately 1:00 p.m. on August 30, 2020, and therefore responsibility for the 1:1 observation was shifted from MWH personnel to SCSO personnel, as well as responsibility for Basilica's care, custody, and control generally, Basilica had been left unattended and/or unobserved by SCSO personnel for

multiple, extended periods of time.  These extended periods of time provided Basilica with ample opportunity to secret the revolver on her person for its unfortunate, ultimate use.

122.    For instance, at 1:38 p.m., Herzig, who was seated at the CAC desk outside of Basilica's room, was noted to not have a good sightline of Basilica in her room.

123.    At 1:44 p.m., Herzig abandoned her post altogether and did not return until 1:46 p.m.

124.    At 1:52 p.m., Herzig closed the door to Basilica's room.  Herzig left Basilica completely unattended and out of Herzig's line of sight until 2:39 p.m., when she finally opened the door to check on Basilica.

125.    At 2:43 p.m., Herzig again abandoned her post but returned one minute later.

126.    At 3:14 p.m., Herzig checked on Basilica but then closed the door to Basilica's room such that it was left slightly ajar.

127.    Herzig then failed to check on Basilica from 3:14 p.m. until 5:09 p.m. – a period of almost two (2) hours.

128.    At 6:19 p.m., First Sergeant Shaun Jones arrived at MWH to take over observation of Basilica from Herzig as the CAC law enforcement officer on duty.

129.    At 7:28 p.m., despite 1:1 observation having been ordered, a nurse closed the door to Basilica's room.  No one would check on Theresa again until 8:53 p.m., almost ninety (90) minutes later, when a nurse reentered the room.  During these 90 minutes, Jones kept looking at his phone or a laptop with no line of sight on Basilica.

130.    Moreover, during the time Basilica was within the care, custody, and control of Defendants and their employees, agents, and/or servants, Defendants never performed a security search of room 32.

## **DEFENDANTS' DUTIES**

131.    At all times relevant herein, Basilica was a qualified individual with disabilities including, but not limited to, bipolar disorder, anxiety, obsessive-compulsive disorder, substance use disorder, lacking capacity to consent to treatment, and expressing suicidal ideation.

132.    Defendants, and each of them, had actual knowledge that Basilica was disabled.

133.    In particular, Defendants, and each of them, had actual knowledge that Basilica was of unsound mind by virtue of the ECO and, later, a TDO that had been issued involuntarily committing Basilica to their care, custody, and control for purposes of receiving mental health evaluation and care.

134.    Vega and Morris were aware and had actual knowledge of the potential harm that Basilica might pose to herself or others by virtue of the issuance of a TDO.

135.    At all times relevant herein, Vega and Morris were aware by their education, experience, and/or training as law enforcement officers that TDOs were only issued for individuals who were likely to harm themselves or others.

136.    Further, Vega and Morris were aware by virtue of their specialized education, experience, and/or training as deputies assigned to the Courts & Civil Process Division, which exclusively handles for the SCSO the transportation of all individuals subject to a TDO, that TDOs were only issued for individuals who were likely to harm themselves or others.

137.    Further, Morris read the TDO issued for Basilica and appended hereto as Exhibit E, which specifically stated the harm Basilica likely posed to herself or others.

138.    Further, Morris had been in contact with Herzig throughout the day on August 30, 2020, to discuss the Basilica case.

139.    The Code of Virginia authorizes judicial intervention to order law enforcement personnel to take into custody and transport for needed mental health evaluation and care an

individual who is unwilling or unable to volunteer for such care.

140.    At all times relevant herein, Basilica was such an individual.

141.    From the initial issuance of an ECO over Basilica, through issuance of a TDO over her, and up until Basilica's untimely death, at all times relevant herein Basilica was committed to the protective care, custody, and control of Defendant Harris, the SCSO, and other employees, agents, and/or servants of Harris and the SCSO, including but not limited to Defendants Vega and Morris, pursuant to Va. Code §§ 37.2-808 through 810.

142.    As a result of the court-ordered commitment of Basilica to Defendants' care, custody, and control, Defendants, and each of them, were accordingly bound by constitutional, statutory, and common law duties attendant to ensuring that Basilica received mental health evaluation and care.

143.    Although Defendants were judicially ordered to ensure that Basilica received mental health evaluation and care, they further accepted such constitutional, statutory, and common law duties voluntarily by virtue of Harris and the SCSO's Mutual Aid Agreements with other law enforcement agencies in the Rappahannock Area.

144.    In addition, at all times relevant herein, the United States Code obligated Defendants, and each of them, to ensure that Basilica, a qualified individual with disabilities, including but not limited to bipolar disorder, anxiety, obsessive-compulsive disorder, substance use disorder, lacking capacity to consent to treatment, and expressing suicidal ideation, not be discriminated against on account of such disability, and not by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity including, but not limited to, that custody and transport necessary to receive mental health evaluation and care.

145.    Further, the United States Code obligated Defendants, and each of them, to ensure

28

that Basilica, a qualified individual with disabilities, including but not limited to bipolar disorder, anxiety, obsessive-compulsive disorder, substance use disorder, lacking capacity to consent to treatment, and expressing suicidal ideation, not be denied the benefits of, or be subjected to discrimination under any program or activity of Harris and/or the SCSO that received federal financial assistance.

146.    The Fourth Amendment to the U.S. Constitution protects citizens against unreasonable searches and seizures, and through the Fourteenth Amendment this right is secured for citizens against the states and their subdivisions, including Defendants herein.

147.    The Fourteenth Amendment of the U.S. Constitution requires that law enforcement agencies and personnel, including Defendants herein, protect people they detain from a known risk of suicide.

148.    Further, Defendants, and each of them, had common law duties of care to Basilica to perform their duties as law enforcement officers in accordance with the applicable standard of care in law enforcement including, but not limited to, the need to constantly maintain 1:1 observation when ordered, and to conduct a proper pat-down search and seizure of an individual, suffering a mental health crisis and known to be a suicide risk, who is going to be transported against her will.

149.    Defendants, and each of them, are accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of their employees, agents, and/or servants including, but not limited to, Defendants herein.

150.    Defendants and other SCSO personnel who encountered Basilica, and each of them, had duties to Basilica to render that degree of knowledge, skill, diligence, and care to Basilica that is rendered by a reasonably prudent law enforcement officer or similar professional in the Commonwealth.

151.    At all times relevant herein, the final policymaking decision maker for the SCSO was Harris.

152.    Notwithstanding the duties described above, Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to Basilica, discriminated against Basilica on account of her disabilities and/or excluded her from participation in or denied her the benefits of the services, programs, or activities of a public entity on account of her disabilities, were grossly negligent, willful and wanton, and/or deliberately indifferent to Basilica's care and needs.

153.    Defendants were keenly aware of the risk that Basilica posed considering: (1) the Dennis Christopher Howard attempted suicide by firearm, in a SCSO vehicle, a mere two (2) years before Basilica's death, which likewise occurred while Howard was in the care, custody, and control of Harris and SCSO deputies; and (2) the fact that such incidents occur with frightening regularity and are the subject of extensive media coverage.[4]

---

[4] *See, e.g.*, Billy Gunn, "Experts: Suicide of Handcuffed Man in Squad Car Rare, But Not Unique," ACADIANA ADVOCATE (La.), Sept. 1, 2014 (available at: https://www.theadvocate.com/acadiana/news/article_adeda750-6d26-5e5d-a5f9-dcb3de417bbd.html); Hannah Rappleye, "Handcuffed Black Youth Shot Himself to Death, Says Coroner," NBC NEWS.COM, Aug. 25, 2014 (available at: https://www.nbcnews.com/news/investigations/handcuffed-black-youth-shot-himselfdeath-says-coroner-n185016); Chelsea Moreno, "New Wrongful Death Lawsuit Filed Against City of Austin Regarding Teen's Suicide In Back of APD Patrol Car," KXAN, Jan. 9, 2021 (available at: https://www.kxan.com/news/local/austin/new-wrongful-death-lawsuit-filed-against-city-of-austin-regarding-teens-suicide-in-back-of-apd-patrol-car/); Latifah Muhammed, "Ohio Police Claim Teen Committed Suicide While Handcuffed in the Back of a Squad Car," VIBE MAGAZINE, Aug. 30, 2017 (available at: https://www.vibe.com/2017/08/ohio-police-xavier-mcmullen-suicide-claimhandcuffed- squad-car); Philip Caulfield, "Chavis Carter Committed Suicide in Back of Police Car: Autopsy," N.Y. DAILY NEWS, Aug. 20, 2012 (available at: https://www.nydailynews.com/news/national/chavis-carter-committed-suicide-backpolice-car-autopsy-article-1.1140421); Michael Tackett, "Black Youth's Death Stirs Indianapolis Tension," CHICAGO TRIBUNE, Oct. 2, 1987 (available at: https://www.chicagotribune.com/news/ct-xpm-1987-10-02-8703140683-story.html); Leyla Santiago, "Durham Chief: Teen Shot Self in Head While in Police Car," WRAL.COM

154.   Notwithstanding the well-known risk of such incidents, and despite the Dennis Christopher Howard incident, it is unconscionable that prior to Basilica's death Harris failed to effect any changes in SCSO policies, procedures, or protocols relating to the handling, searching, seizing, detention, monitoring, and transportation of individuals suffering from mental and/or behavioral health conditions, particularly with respect to SCSO policies, procedures, or protocols related to the handling, searching, seizing, detention, monitoring, and transportation of such individuals to ensure they do not have access to weapons.

155.   It is similarly unconscionable that, to this day, despite the Dennis Christopher Howard incident and now the Basilica incident, Harris has still not conducted any training and/or retraining of SCSO employees, agents, and/or servants relating to the handling, searching, seizing, detention, and transportation of individuals suffering from mental and/or behavioral health conditions to ensure such individuals do not have access to weapons.

156.   Defendants' actions and omissions, in denying obvious and necessary care and attention to Basilica, rose to the level of deliberate indifference to serious medical needs and suicide.

157.   Additionally, the several acts of negligence of individual Defendants, when combined, had a cumulative effect showing a reckless or total disregard of Basilica and her acute mental health condition.

158.   The need for Defendants to conduct a proper pat-down of Basilica to search for weapons was particularly acute given that Vega and Morris, with the assistance of Schroeder,

---

(N.C.), Dec. 11, 2013 (available at: https://www.wral.com/family-wants-fbi-probe-ofdurham-pd-after-teen-s-death-/13206475/). *See*, *e.g.*, Mihn Dam, "Dad of Teen Who Shot Self in Patrol Car Sues County," HOUSTON CHRONICLE, June 13, 2013 (available at: https://www.houstonchronicle.com/news/houston-texas/houston/article/Dad-of-teen-whoshot-self-in-patrol-car-sues-4599549.php).

placed Basilica into restraints, which served to severely worsen Basilica's mental status, her mental health crisis, and the situation generally.

159.    As a direct and proximate cause of the discriminatory, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, and their violations of Constitutional, statutory, and common law duties, Basilica died.

### COUNT ONE -- WRONGFUL DEATH
**Virginia Code § 8.01-50**
**(Against All Defendants)**

160.    Plaintiffs restate and incorporate herein the allegations set forth in Paragraphs 1 through 159 of the Complaint.

161.    Defendants, and each of them, had constitutional, statutory, and common law duties to ensure that Basilica's life and health were properly cared for and maintained throughout the time she was within their care, custody, and control.

162.    Notwithstanding said duties, Defendants, and each of them, breached said duties by, among other things:

a.    Initiating a stop, detention, and/or encounter with Basilica in a grossly negligent and/or willful and wanton manner by, among other things, failing to conduct a proper size-up of room 32, Basilica, and the scene by, among other things, failing to perform a security search of the room and Basilica;

b.    Initiating contact with Basilica in a grossly negligent and/or willful and wanton manner by, among other things: (i) failing to conduct a proper interview with Basilica; (ii) failing to ask Basilica whether she was armed or had any weapons or other dangerous items on her person; (iii) failing to conduct a security search of Basilica's room and her person for weapons; and (iv) failing to perform a pat-down search of Basilica;

c.    Preparing Basilica for transport to a mental health facility in a grossly negligent and/or willful and wanton manner by, among other things: (i) failing to conduct a proper interview with Basilica; (ii) failing to ask Basilica whether she was armed or had any weapons or other dangerous items on her person; (iii) failing to conduct a security search of Basilica's room and her person for weapons; (iv)

failing to perform a pat-down search of Basilica; and (v) restraining Basilica by leg shackles, belly chain, and handcuffs, which exacerbated and worsened Basilica's  mental status, her mental health crisis, and the situation generally, thus further constituting gross negligence and/or willful and wanton conduct;

d.  Transferring Basilica from her bed to a wheelchair in a grossly negligent and/or willful and wanton manner by, among other things: (i) failing to conduct a proper interview with Basilica; (ii) failing to ask Basilica whether she was armed or had any weapons or other dangerous items on her person; (iii) failing to conduct a security search of Basilica's room and her person for weapons; (iv) failing to perform a pat-down search of Basilica; and (v) restraining Basilica by leg shackles, belly chain, and handcuffs, which exacerbated and worsened Basilica's  mental status, her mental health crisis, and the situation generally, thus further constituting gross negligence and/or willful and wanton conduct;

e.  Transporting Basilica via wheelchair to a SCSO vehicle in a grossly negligent and/or willful and wanton manner by, among other things: (i) failing to conduct a proper interview with Basilica; (ii) failing to ask Basilica whether she was armed or had any weapons or other dangerous items on her person; (iii) failing to conduct a security search of Basilica's person for weapons; (iv) failing to perform a pat-down search of Basilica; and (v) restraining Basilica by leg shackles, belly chain, and handcuffs, by Vega restraining Basilica by the arm, and by Morris restraining Basilica by pulling on Basilica's jacket hood, which exacerbated and worsened Basilica's mental status, her mental health crisis, and the situation generally, thus further constituting gross negligence and/or willful and wanton conduct;

f.  Loading Basilica from a wheelchair and into a SCSO vehicle in a grossly negligent and/or willful and wanton manner by, among other things: (i) failing to conduct a proper interview with Basilica; (ii) failing to ask Basilica whether she was armed or had any weapons or other dangerous items on her person; (iii) failing to conduct a security search of Basilica's person for weapons; (iv) failing to perform a pat-down search of Basilica; and (v) restraining Basilica by leg shackles, belly chain, and handcuffs, which exacerbated and worsened Basilica's  mental status, her mental health crisis, and the situation generally, thus further constituting gross negligence and/or willful and wanton conduct;

g.  Transporting Basilica via SCSO vehicle in a grossly negligent and/or willful and wanton manner by, among other things: (i) failing to conduct a proper interview with Basilica; (ii) failing to ask Basilica whether she was armed or had any weapons or other dangerous items on her person; (iii) failing to conduct a security

search of Basilica's person for weapons; (iv) failing to perform a pat-down search of Basilica; and (v) restraining Basilica by leg shackles, belly chain, and handcuffs, which exacerbated and worsened Basilica's mental status, her mental health crisis, and the situation generally, thus further constituting gross negligence and/or willful and wanton conduct;

h.  Failing to properly restrain Basilica so as to ensure she had no access to weapons once she was inside the SCSO vehicle;

i.  Failing to properly monitor Basilica throughout their encounter with her so as to ensure she had no access to weapons; and

j.  Failing to properly coordinate and/or communicate with employees, agents, and/or servants of MWH, and Harris and/or the SCSO, to ensure that reasonable precautions, including security searches, pat-down searches, and continuous 1:1 observation, had been maintained throughout the time Basilica was within the care, custody, and control of Harris and/or the SCSO.

163.   At all times relevant herein, from at least her initial presentation at MWH and continuing until the time she took her own life, Basilica was of unsound mind.

164.   At all times relevant herein, Defendants had actual knowledge that Basilica was of unsound mind by, among other things, their actual knowledge that Basilica was under an ECO and, later, a TDO.   Moreover, as set forth above, Defendants had actual knowledge of the circumstances under which a TDO may be issued, and the specifics of the TDO actually issued as to Basilica.

165.   Defendants, and each of them, were grossly negligent in that their actions and inactions showed such indifference to Basilica as to constitute an utter disregard of caution amounting to a complete neglect of the safety of Basilica, such as would shock fair-minded people.

166.   Defendants, and each of them, were willful and wanton in that they acted, or failed to act, consciously in disregard of Basilica's rights.  In addition, Defendants acted, or failed to act, with a reckless indifference to the consequences to Basilica when they were aware of their conduct

and also aware, from their knowledge of existing circumstances and conditions, that their conduct would probably result in injury to Basilica.

167. Defendant Harris is liable for the gross negligence and/or willful and wanton conduct of Defendants Vega and Morris, and each of them, and was otherwise grossly negligent and/or willful and wanton.

168. As a direct and proximate result of the gross negligence and/or willful and wanton conduct of Defendants, and each of them, Basilica died.

169. As a direct and proximate cause of the gross negligence and/or willful and wanton conduct of Defendants, and each of them, which contributed to and was the proximate cause of Basilica's injuries and death, the statutory beneficiaries have sustained damages including, but not limited to:

    a.      Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

    b.      Loss of services, protection, care, and assistance provided by the decedent.

170. As a direct and proximate cause of the gross negligence and/or willful and wanton conduct of Defendants, and each of them, which contributed to and was the proximate cause of Basilica's death, the Estate of Basilica sustained damages, including, but not limited to:

    a.      Reasonable funeral expenses.

171. The gross negligence and/or willful and wanton conduct of Defendants, and each of them, establish causes of action for monetary relief consisting of compensatory and punitive damages, and costs to the Plaintiffs.

## COUNT TWO -- DEPRIVATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983
**(Unreasonable Search and Seizure in Violation of Fourth and Fourteenth Amendments –
Against Defendants Vega and Morris)**

172.     Plaintiffs restate and incorporate herein the allegations set forth in Paragraphs 1 through 171 of the Complaint.

173.     The Fourth and Fourteenth Amendments protect citizens "against unreasonable searches and seizures" from the state or subdivisions thereof including the Defendants herein.

174.     A reasonable search and seizure of Basilica by Vega and Morris at any point between their initial contact with Basilica and her untimely death would have uncovered the revolver with which she took her own life.

175.     In failing to perform a reasonable search and seizure, Vega and Morris violated the Fourth and Fourteenth Amendments, causing Basilica's death and entitling Plaintiffs to compensatory damages.

176.      The acts or omissions of Vega and Morris were conducted within the scope of their official duties and employment and under color of law.

177.     As a direct and proximate result of Vega and Morris's conduct, Basilica died, and her death was attributable to the deprivation of her constitutional rights in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and actionable under 42 U.S.C. § 1983.

178.     Vega and Morris's aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Basilica's rights, by reason of which Plaintiffs are entitled to recover punitive damages.

179.     Vega and Morris's violations of the Fourth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees, and costs.

36

## COUNT THREE -- DEPRIVATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983
**(Deliberate Indifference/Failing to Protect From Known Suicide Risk Violation of
Fourteenth Amendment – Against Defendants Vega and Morris)**

180.    Plaintiffs restate and incorporate herein the allegations set forth in Paragraphs 1 through 179 of the Complaint.

181.    During the entire time she was within the custody, care, and control of Defendants, Basilica was known to be suffering a mental health crisis and was a known suicide risk.

182.    Defendants, and each of them, knew of the potentially life-threatening dangers associated with failing to properly and thoroughly observe, monitor, and care for Basilica, in a manner consistent with the standard of care in law enforcement.

183.    Nevertheless, at all times relevant to the allegations in this Complaint, Vega and Morris, and each of them, were deliberately indifferent to Basilica's serious medical need and suicide risk and disregarded it by failing to properly ensure Basilica did not have access to weapons during their encounters with her and, in particular, prior to transport, thereby creating a substantial risk of injury and death and resulting in the unnecessary and wanton infliction of pain upon Basilica, and ultimately her death, all under color of law and in violation of the Fourteenth Amendment to the U.S. Constitution.

184.    Vega and Morris's deliberate indifference was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

185.    The acts or omissions of Vega and Morris were conducted within the scope of their official duties and employment and under color of law.

186.    As a direct and proximate result of Defendants Vega and Morris's conduct, Plaintiff died, attributable to the deprivation of her constitutional rights in violation of the Fourteenth Amendment to the U.S. Constitution and actionable under 42 U.S.C. §1983.

187.    Vega and Morris's aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Plaintiff's rights, by reason of which Plaintiff is entitled to recover punitive damages.

188.    Vega and Morris's violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs.

### COUNT FOUR -- DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983
### (Policy, Custom, and/or Practice Claim – Against Defendant Harris)

189.    Plaintiffs restate and incorporate herein the allegations set forth in Paragraphs 1 through 188 of the Complaint.

190.    Basilica's death, in no uncertain terms, is attributable to Harris' actions and, more importantly, inactions, as the chief policy and decisionmaker for the SCSO.

191.    As manifest by both the Dennis Christopher Howard incident which preceded Basilica's death, and the events surrounding Basilica's death itself, at all times relevant herein, Harris and the SCSO and their employees, agents, and/or servants had a custom or practice of failing to properly handle, search, seize, detain, and transport individuals with mental and/or behavioral health conditions, especially with respect to handling, searching, seizing, detaining, and transporting such individuals so as to ensure they do not have access to weapons.  Harris was subjectively aware of the pattern of similar incidents that occurred prior to Basilica's death, in

particular the attempted suicide of Dennis Christopher Howard that likewise occurred on his watch, and other similar incidents around the United States.

192.     Furthermore, Harris and the SCSO had a custom or practice of failing to train personnel on how to properly handle, search, seize, detain, and transport individuals with mental and/or behavioral health conditions in order to ensure such individuals do not have access to weapons. Failing to adequately train (or retrain) SCSO employees, agents, and/or servants about performing reasonable searches and seizures to locate weapons is a particular omission in the training program that would cause, and in the case of Basilica did proximately cause, SCSO personnel to violate the constitutional rights of members of the public they encountered, like Basilica. Nevertheless, though Harris knew of these obvious deficiencies, particularly in the wake of the Dennis Christopher Howard incident, he chose to retain his and SCSO's dangerously flawed training (and retraining) program.

193.     Had Vega and Morris been adequately trained, they would have performed a reasonable search and seizure of Basilica and discovered the revolver.

194.     These customs and practices were actually known, constructively known, and/or ratified by Harris as the SCSO policymaker.

195.     Harris was deliberately indifferent to these dangerous customs and practices by failing to train, inadequately training, and by making no changes to customs, practices, or policies in the face of a dangerous pattern of unreasonable handling, searching, seizing, detention, and transportation of individuals with mental and/or behavioral health conditions.

196.     The known and obvious consequence of failing to reasonably handle, search, seize, detain and transport individuals with mental and/or behavioral health conditions and of continuing a deficient, inadequate, and dangerous training (or lack of training) program, is that SCSO

employees, agents, and/or servants would be placed in recurring situations in which the constitutional violations described within this Complaint would result. Accordingly, these customs or practices also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

197.    Further, neither Harris nor the SCSO has a policy addressing suicide prevention.

198.    Neither Harris nor the SCSO trains officers on how to address armed, suicidal subjects in SCSO vehicles.

199.    Harris knew of and had actual knowledge of the risk that an individual suffering from mental and/or behavioral health conditions might commit suicide (or harm or kill law enforcement), unless such an individual was properly handled, searched, seized, detained, and transported so as to ensure they do not have access to weapons, particularly given that the Dennis Christopher Howard incident occurred a mere two (2) years prior to Basilica's death.

200.    Harris knew of and had actual knowledge that Harris and SCSO employees, agents, and/or servants had a custom and practice of unreasonably handling, searching, seizing, detaining, and transporting individuals suffering from mental and/or behavioral health conditions by failing to ensure such individuals do not have access to weapons.

201.    Harris knew that SCSO employees, agents, and/or servants would encounter members of the public suffering from mental and/or behavioral health conditions, and that some of these individuals might be armed.

202.    Despite knowing that suicides could (and do) occur in custody and law enforcement vehicles, and despite knowing that SCSO employees, agents, and/or servants were failing to ensure individuals with mental and/or behavioral health conditions did not have access to weapons, Harris did not implement any policies (including additional training or retraining) to address this known,

dangerous situation.

203.    As such, Harris and the SCSO were deliberately indifferent to the risk that individuals with mental and/or behavioral health conditions with suicidal tendencies face, including the potential that such an individual would commit suicide in a SCSO vehicle.

204.    As a direct and proximate result of the customs, practices, policies, and failure to train and/or retrain as delineated above, Harris is liable for Basilica's death entitling Plaintiffs to an award of compensatory damages, attorney's fees, and costs.

**COUNT FIVE – VIOLATION OF TITLE II OF THE
AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12132**
**(Against Defendant Harris)**

205.    Plaintiffs restate and incorporate herein the allegations set forth in Paragraphs 1 through 204 of the Complaint.

206.    Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

207.    Basilica suffered from bipolar disorder, anxiety, obsessive-compulsive disorder, substance use disorder, lacking capacity to consent to treatment, and expressing suicidal ideation, conditions which substantially limited one or more of her life activities, which were documented, and were conditions she was generally regarded to have suffered.  Basilica was a "qualified individual" within the meaning of the ADA.

208.    Harris was a law enforcement officer locally elected as provided for by Article VII, Section 4 of the Constitution of Virginia, and in such capacity was a "public entity."  Harris was responsible for the hiring, training, supervision and conduct, including the acts and failures

to act, of those employees, agents, and/or servants of Harris and the SCSO committed within the course and scope of their employment, under the doctrine of *respondeat superior.*

209.    Harris and SCSO employees, agents, and/or servants have the express power, authority, and responsibility to take into, and retain in, their custody for mental health evaluation and care those individuals subject to an ECO or TDO, independently without input or assistance from any other agency or entity.  The handling, searching, seizing, detention, monitoring, and transportation of an individual suffering from a mental and/or behavioral health condition, for purposes of helping them receive mental health evaluation and care, constitutes a service, program, or activity of a public entity.

210.    At all times relevant herein, Harris was on notice that there was a need for a specialized law enforcement response to members of the public suffering from mental and/or behavioral health conditions.

211.    At all times relevant herein, Harris and the SCSO, and their employees, agents, and/or servants, including but not limited to Defendants Vega and Morris, were aware that Basilica was a qualified individual with a disability.

212.    In particular, throughout the entire time Basilica had been committed to the care, custody, and control of Harris and the SCSO, as well as their employees, agents, and/or servants, including but not limited to Defendants Vega and Harris, which period of time began at least with Herzig's service of the ECO upon Basilica and continuing up until the time of Basilica's untimely death, Defendants were aware that Basilica was a qualified individual with a disability.

213.    Encounters with individuals with disabilities, many of which, as here, involve no criminal conduct, are an everyday part of law enforcement.

214.    Preserving the ADA's protections in those encounters is at the heart of the statute's non-discrimination mandate.

215.    The ADA requires law enforcement officers to provide reasonable accommodations for individuals with disabilities, including those suffering from mental and/or behavioral health conditions, at the time such individuals are taken into their care, custody, and control for purposes of receiving mental health evaluation and care.

216.    Throughout the time Basilica was committed to the care, custody, and/or control of Defendants, Basilica did not pose a threat to any individuals other than herself.

217.    Defendants were aware that Basilica's conduct was symptomatic and reflective of one or more of her disabilities, particularly her lack of capacity to consent to treatment and suicidal ideation, and that they required accommodation.

218.    There was no reason that Defendants could not have provided a reasonable accommodation for Basilica's disabilities, particularly her lack of capacity to consent to treatment and suicidal ideation, by, among other things, conducting a pat-down search of Basilica to ensure she did not have access to any weapons during the time of their handling, searching, seizing, detention, monitoring, and transportation of Basilica.

219.    Having taken custody of Basilica at a time Defendants were aware of Basilica's disabilities, particularly her lack of capacity to consent to treatment and suicidal ideation, Defendants had a duty to reasonably accommodate Basilica's disabilities by, among other things, conducting a pat-down search of Basilica to ensure she did not have access to any weapons during the time of their handling, searching, seizing, detention, monitoring, and transportation of Basilica.

220.    Defendants disregarded their duty, were deliberately indifferent to and intentionally

ignored Basilica's known disabilities, and deprived Basilica, a qualified individual, from reasonable accommodations under the ADA. As a direct and proximate result, Basilica died.

221.    Discrimination includes the failure to reasonably accommodate a person's disabilities.

222.    Defendants had care, custody, and control of Basilica at a critical moment and rather than accommodating her known disabilities by, among other things, conducting a pat-down search of Basilica to ensure she did not have access to any weapons during the time of their handling, searching, seizing, detention, monitoring, and transportation of Basilica, Defendants failed to reasonably accommodate Basilica's disabilities thereby discriminating against her and violating the ADA, causing her death.

223.    Discriminatory treatment based on a disability can be avoided by proper training.

224.    In light of, and incorporating, those facts and allegations set forth in all of the preceding paragraphs, an entity such as Harris and the SCSO had an obligation and duty to Basilica and any other qualified individual they may have encountered, to provide training to its employees, agents, and/or servants so as to educate them as to how to reasonably handle individuals with disabilities, including but not limited to those who lack capacity to consent to treatment, and those expressing suicidal ideation.

225.    Among the most basic of core functions of an entity such as Harris and the SCSO is the lawful exercise of police powers by those officials acting under color of law. These essential functions are activities covered by the ADA and the failure by Harris and the SCSO to properly train its employees, agents, and/or servants for encounters with disabled individuals proximately caused Basilica to be discriminated against and excluded from otherwise reasonable and necessary

44

accommodations, and from participation in the benefits of the services, programs, or activities of a public entity.

226.    Harris and the SCSO had ample opportunity, knowledge and impetus, well in advance of August 30, 2020, indeed particularly after the Dennis Christopher Howard incident, to have created, drafted, adopted, modified and/or implemented policies and a training program to provide their employees, agents, and/or servants with the tools and resources reasonably necessary to handle individuals with disabilities, such as those who lack capacity to consent to treatment, and those expressing suicidal ideation.

227.    Such modifications or implementations to their policies, procedures, and training are subject matters which are inherently included in the scope of those services, programs, and activities covered under the ADA as accommodations to which individuals such as Basilica were entitled.

228.    Defendants' failure to modify or implement their policies, procedures, and training in this regard constitutes a failure to provide reasonable accommodations and this failure to train was a violation of the ADA.  As a direct and proximate result, Basilica died.

229.    Basilica was, solely by reason of her disability, excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or was otherwise subjected to discrimination by the Harris and the SCSO.  As a direct and proximate result, Basilica died.

230.    Failure to employ techniques appropriate to dealing with an individual known to be suffering from a mental and/or behavioral health condition constitutes precisely the sort of discrimination against individuals with disabilities that the ADA was intended to address.

45

231.   Harris and the SCSO's violations of the ADA entitle Plaintiffs to an award for compensatory damages, declaratory and injunctive relief, attorney's fees, and costs.

<u>**COUNT SIX – VIOLATION OF THE REHABILITATION ACT**</u>
**29 U.S.C. § 794(a)**
**(Against Defendant Harris)**

232.   Plaintiffs restate and incorporate herein the allegations set forth in Paragraphs 1 through 231 of the Complaint.

233.   At all times relevant herein, the handling, searching, seizing, detention, monitoring, and transportation of an individual suffering from a mental and/or behavioral health condition, for purposes of helping them receive mental health evaluation and care, was a program or activity of Harris and the SCSO as defined by 29 U.S.C. § 794(b).

234.   At all times relevant herein, Harris and the SCSO has received and continues to receive federal funding.

235.   Harris and the SCSO's actions and/or inactions as described above, and in particular as detailed in Count V, violated the Rehabilitation Act.

236.   As a direct and proximate result of Harris and the SCSO's violations of the Rehabilitation Act, Basilica died.

237.   Harris and the SCSO's violations of the Rehabilitation Act entitle Plaintiffs to an award for compensatory damages, declaratory and injunctive relief, attorney's fees, and costs.

WHEREFORE, FOR THE FORGOING REASONS, Mark Basilica and Roberta Basilica, Administrators of the Estate of Theresa Marie Basilica, Deceased, by counsel, prays for and demands judgment against Defendants Roger Harris, Rachel Catherine Vega a/k/a Rachel Catherine Kiecana, and Jason Charles Morris, jointly and severally, as follows:

46

(1)     Compensatory damages in the amount of TWENTY MILLION DOLLARS ($20,000,000), plus pre-judgment interest from August 31, 2020, and post-judgment interest;

(2)     Punitive damages in the amount of THREE HUNDRED FIFTY THOUSAND ($350,000), plus pre-judgment interest from August 31, 2020, and post-judgment interest;

(3)     An award for attorneys' fees and costs herein expended as authorized by 42 U.S.C. § 1988, 42 U.S.C. § 12133, and 29 U.S.C. § 794a;

(4)     Declaratory and injunctive relief to redress and remedy Harris and the SCSO's violations of the Americans with Disabilities Act and Rehabilitation Act; and

(5)     Such other legal and equitable remedies as may be allowed by law.

**TRIAL BY JURY IS DEMANDED.**

DATED:  July 27, 2022.

> MARK BASILICA and ROBERTA BASILICA, Administrators of the Estate of THERESA MARIE BASILICA, Deceased,
>
>
> By: / s / Mark Dennis Dix
>             Counsel

Mark D. Dix [VSB No. 42718]
DIX LAW GROUP, PLLC
Truist Place
919 East Main Street, Suite 625
Richmond, Virginia 23219
Tel.: (804) 500-6290
Fax: (804) 500-6291
Email: mdix@dixlawfirm.com
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of July 2022, I caused the original Amended Complaint to be filed using the Court's CM/ECF system which will send an electronic copy and Notice of Electronic Filing ("NEF") to the following:

William W. Tunner, Esquire
William D. Prince, IV, Esquire
Rachel W. Adams, Esquire
THOMPSONMCMULLAN, PC
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
*Counsel for Defendants*

/ s / Mark Dennis Dix
Mark D. Dix [VSB No. 42718]
DIX LAW GROUP, PLLC
Truist Place
919 East Main Street, Suite 625
Richmond, Virginia 23219
Tel.: (804) 500-6290
Fax: (804) 500-6291
Email: mdix@dixlawfirm.com